UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Laura Magnusson**

     **v.**                              Case No. 08-cv-276-PB
                                          Opinion No. 2009 DNH 054

**Michael J. Astrue, Commissioner,**
**US Social Security Administration**

### MEMORANDUM AND ORDER

Pursuant to 42 U.S.C. § 405(g), Laura Magnusson seeks review of the Commissioner's decision finding her disabled as of January 9, 2007.  Magnusson argues that the finding of her disability onset date is not supported by substantial evidence and faults the Administrative Law Judge ("ALJ") for failing to comply with the requirements of Social Security Ruling 83-20.  The Commissioner objects and moves for an order affirming his decision.

## I. BACKGROUND[1]

### A.  Administrative Proceedings

Magnusson filed an application for a period of disability and Disability Insurance Benefits ("DIB") on February 13, 2006,

---

[1] Citations to the Administrative Transcript are indicated as "Tr.".  The parties have submitted a Joint Statement of Material Facts which, because it is part of the court's record (Doc. No. 11), need not be recounted in full in this Order. Those facts most relevant to the disposition of this matter are summarized as appropriate.

claiming that she became disabled on May 20, 2005 due to breast cancer and arthralgia (joint pain).  <u>Tr.</u> at 89-94, 98.  Her application was denied, and Magnusson requested an administrative hearing.  <u>Id.</u> at 46-48, 52.  ALJ James J. D'Alessandro held the hearing on April 29, 2007, at which Magnusson, who was represented by counsel, and a vocational expert appeared and testified.  <u>Id.</u> at 6-30, 41.  By the time of the hearing, Magnusson also claimed that she suffered from depression and Post Traumatic Stress Disorder ("PTSD").  <u>Id.</u> at 9-10.  On May 25, 2007, the ALJ issued his decision, finding that Magnusson became disabled due to her impairments on January 9, 2007, and thus she was entitled to a period of disability beginning on that date and to DIB.  <u>Id.</u> at 38-45.  The ALJ's decision became ripe for review as the final decision of the Commissioner when the Appeals Council denied Magnusson's request for review on June 2, 2008.  <u>Id.</u> at 2-4.

**B.    <u>Factual Background</u>**

Magnusson was forty-five years old at the time of the ALJ's decision.  <u>Tr.</u> at 38.  In her application, she alleged that she had been disabled due to breast cancer and arthralgia since May 20, 2005, when she stopped engaging in substantial gainful activity.  <u>Id.</u>  Magnusson has a high school education, and past

relevant work experience as a salon owner and operator, a child care worker, a public school paraprofessional, a permanent substitute teacher, a court monitor, a telephone company customer service representative, and a retail salesclerk.  Id.  Most recently, Magnusson worked four hours a day, five days per week earning $9.00 an hour at a child-care center from November 2005, through February 2006, and part time as a receptionist from March 2006, until shortly before the ALJ administrative hearing.  Id. at 15, 110, 113-14, 157.  At the time of the hearing, Magnusson was taking courses online towards a master's degree in education. Id. at 15-16.

C.   **Medical Evidence**

a.   ***Physical Impairments***

In early May 2005, Magnusson found a lump in her right breast, which was diagnosed as small, invasive grade III ductal carcinoma.  Tr. at 167, 226.  On June 9, 2005, Magnusson underwent a lumpectomy and complete right anxillary dissection, which revealed one lymph node positive for metastatic disease, requiring further treatment.  Id. at 227.  She was treated with chemotherapy by Dr. Denis Hammond, and thereafter received radiation therapy from Dr. Asa Nixon.  Id. at 272-76, 263.  Near the end of Magnusson's treatments in late October 2005, she began

to experience hot flashes, for which Dr. Nixon prescribed Paxil.
Id. at 265.

In November 2005, after the completion of her cancer
treatment, Magnusson began to complain of significant joint pain
in her shoulders, hips, elbows, and knees.  Id. at 263, 329.  Dr.
Hammond referred Magnusson to Dr. John Yost, who examined
Magnusson on January 16, 2006 and assessed an atypical diffuse
pain syndrome.  Id. at 313-14.  Magnusson's complaints to Dr.
Hammond and Dr. Nixon of joint paint and pain in her right breast
persisted throughout 2006 and early 2007.  Id. at 331, 349, 351.

### b.   *Mental Impairments*

Magnusson first reported anxiety and fatigue to her primary
care physician, Dr. Kristin Vaughan, on June 29, 2006.  Tr. at
308.  She reported that she was not depressed, but that she was
experiencing stress.  Id.

On October 18, 2006, Magnusson saw psychiatrist Dr. Amy
Feitelson at Seacoast Mental Health Center, seeking an evaluation
for medication.  Id. at 341.  Magnusson reported that she had
been in good health until May 2005 when a breast lump was found.
Id.  She stated that she had been suffering from depression and
frequent crying spells since August 2006, making it difficult to
work.  Id.  Magnusson further reported that she had trouble
sleeping due to nightmares and racing thoughts, that she felt

-4-

overwhelmed, and that her concentration was poor.  Id. at 341-42.
She stated that her energy was low and she had anhedonia.  Id. at
341.  Magnusson cried throughout the interview with Dr.
Feitelson.  Id. at 342.  Dr. Feitleson noted that Dr. Yost and
Dr. Vaughan had given Magnusson antidepressants, but Magnusson
reported that she had not taken the medication.  Id. at 341.

Upon exam, Dr. Feitelson noted that Magnusson's mood was
depressed; her affect was constricted; her speech rate and rhythm
were regular; her thought content was positive for anxious
ruminations; her judgment and insight were good, and her
vegetative symptoms were positive for initial insomnia with
nightmare, increased startle reflex, low energy, anhedonia,
increased nighttime eating, anxious ruminations, and subjectively
poor concentration.  Id. at 342.  Dr. Feitelson diagnosed
Magnusson with major depressive episode and assessed a Global
Assessment of Functioning ("GAF") score of 65.  Id.  Dr.
Feitelson prescribed Prozac and noted that psychotherapy would be
helpful.  Id. at 343.

On October 31, 2006, during a visit at Dr. Hammond's office,
a physician's assistant noted that Magnusson was very teary-eyed
during the visit and very unhappy with her body image.  Id. at
347.  Magnusson reported crying many times throughout the day,
and that she was currently taking Prozac at the direction of Dr.

Feitelson.  Id.  The physician's assistant further noted that a bout with viral meningitis in August 2006, and a scare involving a new breast cyst (which turned out to be benign) several months earlier had caused Magnusson much anxiety.  Id.

On November 2, 2006, Magnusson saw Dr. Molly Hendrick at Seacoast Mental Health Center and reported symptoms of hopelessness; irritability; mood changes; sadness; anger and rage; feelings of guilt and shame; difficulty enjoying life; problems sleeping; anxiety attacks; agitations; somatic complaints; difficulty concentrating; ruminative worry; distractability; low self-esteem; and social isolation.  Id. at 345.  Dr. Hendrick noted that Magnusson's status was unchanged from her evaluation by Dr. Feitelson and that her symptoms appeared to be related to her breast cancer diagnosis and chemotherapy.  Id.  Dr. Hendrick assessed that Magnusson would benefit from ongoing therapy, but Magnusson did not return to Seacoast Mental Health Center due to financial issues.  Id. at 20, 345.

At the suggestion of her attorney, Magnusson underwent a psychological evaluation by clinical psychologist Dr. Tracey Alysson on December 8, 2006, and January 9, 2007.  Id. at 353-64. In a January 10, 2007 report, Dr. Alysson noted that, during the evaluation, Magnusson reported difficulty with short-term memory;

-6-

difficulty maintaining concentration; depression; depressed mood; loss of pleasure in life; severe self-criticism and self-blame; social isolation; vegetative symptoms of sleep disturbance, irritability, change in appetite, decreased libido, and decreased energy; restlessness; agitation; anger; and anxiety.  Id. at 356-58.  Dr. Alysson noted that Magnusson had reported symptoms that are classic diagnostic indicators of trauma, including a startle response and hyper-alertness.  Id.  Based on Magnusson's self-reported difficulties, Dr. Alysson administered a series of tests, the results of which were consistent with short-term memory impairment; difficulty maintaining concentration; a chronic, very high level of anxiety; a high level of felt anger and, at times, expressed anger that was not inappropriate or out of control; and a history of a significant traumatic experience in her life.  Id.

Dr. Alysson noted that Magnusson's reported symptoms and test results suggested that she was suffering from PTSD.  Id. at 358.  Accordingly, Dr. Alysson administered two additional tests to assess specifically for PTSD.  Id. at 359.  On both tests, Magnusson scored positive for PTSD, with accompanying high levels of irritability, anxiety, and significant depression.  Id. at 359, 363-64.  Magnusson's results further indicated that her coping level was impaired, that is, she was unable to fully face

and resolve her traumatic issues, and that she was struggling with her sense of identity.  Id. at 359.  In addition, Dr. Alysson noted that all of Magnusson's PTSD symptoms were related to her cancer history and experiences.  Id.

Dr. Alysson diagnosed Magnusson with PTSD, subsequent to cancer diagnosis and treatment, chronic major depression, and severe social phobia.  Id. at 360.  In addition, Dr. Alysson noted that the onset and focus of the trauma originated around May 2005, the time of Magnusson's breast cancer diagnosis.  Id. at 361.  Dr. Alysson opined that although Magnusson's symptoms fit the definition of chronic PTSD (a duration of six months or more), her disorder was not yet truly chronic, because she had not stabilized herself nor reformed her identity and functioning around a traumatic adjustment.  Id.  Dr. Alysson assessed a GAF score of 35 to 40, which represents major impairment in several areas, such as work, thinking, or mood.  Id. at 360.  She opined that Magnusson was unable to work and unable to maintain consistent standards of behavior and functioning at work or at home; that she was severely depressed; and that she needed to resolve significant changes in body image and sense of self.  Id. Dr. Alysson also noted a massive impact in Magnusson's ability to function socially.  Id. at 361.  Magnusson was fighting the disorder, which boded well for her prognosis, but Dr. Alysson

-8-

urged that Magnusson find financial support to get appropriate psychotherapy.  Id. at 361-62.

On January 10, 2007, Dr. Alysson drafted a mental residual functional capacity assessment ("MRFCA") for Magnusson.  Id. at 365-67.  Dr. Alysson opined that Magnusson was not able to maintain memory for information shared, whether in verbal or written form; she was not able to sustain concentration; she suffered from significant intrusive thoughts and memories, which generally impaired her ability to concentrate on the present; her energy level was low; her persistence was brittle and erratic; her moderate social phobia impaired her ability to go out into the world and engage in work or other daily tasks; her high level of irritability made social engagement difficulty; she easily became reactive when frustrated; she could not be interrupted in a task; she could not interface with people at work and maintain a level of functioning; and, she did not have the flexibility to cope with stress or change.  Id. at 366-67.

On January 8, 2007, Magnusson met with Dr. Hammond and reported increasing depression and frequent crying.  Id. at 351. Dr. Hammond noted that Magnusson was tearful during the interview and obviously depressed, sitting slumped over.  Id.  Dr. Hammond urged Magnusson to fill a sleeping pill prescription ordered by Dr. Vaughan and increased her Prozac to 40 milligrams per day.

-9-

Id.  During a subsequent visit on February 5, 2007, Dr. Hammond noted that Magnusson continued to suffer from a profound degree of anxiety and depression and that she cried throughout the examination.  Id. at 370.

On January 19, 2007, Magnusson saw Dr. Vaughan, who noted that Magnusson complained that she could not stop crying.  Id. at 369.  Magnusson discussed Dr. Alysson's report with Dr. Vaughan. Id.  After the visit, Dr. Vaughan wrote a letter, ostensibly to Magnusson's professors, stating that she had significant anxiety and other health issues, and thus could not be in class for more than two hours.  Id. at 368.  On February 6, 2007, Dr. Alysson wrote a similar letter noting that it was difficult for Magnusson to leave home and be around the normal flow of social interaction.  Dr. Alysson wrote that Magnusson's difficulties were symptoms of PTSD, which is a result of a her battle with cancer.  Id. at 371.

On June 20, 2007, Dr. Alysson wrote another letter, "To Whom It May Concern," clarifying her opinion expressed in her January 10, 2007, report.[2]  Id. at 87-88.  Dr. Alysson noted that she did not interview Magnusson with an intention to pinpoint the onset

_____

[2] This letter post-dates the ALJ's decision and thus, was not part of the record before the ALJ.  The letter was submitted as additional evidence with Magnusson's request for review of the ALJ's decision by the Appeals Council.  Tr. at 83.

of PTSD, but that comments made by Magnusson throughout out the evaluation and the results of her psychological tests suggested that the onset of Magnusson's PTSD likely was close to the date of her cancer diagnosis.  Id. at 87.  Dr. Alysson concluded that her opinion had not been that Magnusson's PTSD had onset or worsened around January 10, 2007.  Id.  Rather, Magnusson's symptoms and functional limitations, including those limitations identified in the MRFCA completed by Dr. Alysson, arose at the time of her cancer diagnosis and treatment.   Id.

**D.   Hearing Testimony**

On April 19, 2007, Magnusson testified that she was diagnosed with breast cancer in 2005, felt very sick during her cancer treatment, and did not have the energy to go back to work in the fall of 2005.  Tr. at 11-12.  Magnusson testified that she first became depressed during the summer of 2005 when she was receiving cancer treatment.  Id. at 13.  She stated that she wanted to go back to work after treatment, but that she had trouble with job interviews.  Id. at 14.  Magnusson testified that she began to stay in bed, take lots of naps, and stay in the house; she did not want people to see her because she felt ugly. Id.  Magnusson further testified that she believed that her depression worsened over time.  Id.  She stated that originally she tried to fight the depression.  Id.  She was taking Prozac, but did not believe that it had helped.  Id. at 19. She stated

that she was not seeing a therapist or psychiatrist because she did not have insurance and could not afford the appointments. Id. at 20.

In addition, Magnusson testified that in the spring of 2006, she began a receptionist job at a gym. Id. at 14. In the beginning, she worked about ten hours per week, but ten hours per week proved to be too much, as often she was sent home because she cried frequently and did not deal well with customers. Id. at 15. More recently, she had reduced her schedule to three hours per week, and, just prior to the hearing date, had stopped working altogether. Id. She stated that she was really stressed out by having to go in for three hours, she did not want to get out of bed, and she always clocked in twenty minutes late. Id. Magnusson further testified that she would not return to her past work as a licensed cosmetologist because of her inability to stand all day due to her physical pain and her inability to deal with customers. Id. at 20-21. Magnusson also testified that most of her course work toward her master's degree was completed online and described how she had difficulty when she was required to attend class. Id. at 15-17.

A vocational expert described Magnusson's past relevant work and testified that a hypothetical individual with the same vocational background, limited to light work that is not high stress and not high contact with other people, could not perform

any of Magnusson's past relevant work, but could perform the light, unskilled positions of cleaner and stuffer.  <u>Id.</u> at 26-28. He further testified that, assuming the limitations identified by Dr. Alysson in her MRFCA, the individual could not perform either the cleaner or the stuffer job.  <u>Id.</u> at 29.

**E.   <u>ALJ Decision</u>**

In his May 25, 2007 decision, the ALJ followed the sequential evaluation process for determining whether a claimant is disabled.  <u>Tr.</u> at 43-44.  First, the ALJ found that Magnusson had not engaged in substantial gainful activity since May 20, 2005.  <u>Id.</u> at 43.  Next, the ALJ found that Magnusson suffered from the severe impairments of PTSD, breast cancer, and arthralgia.  <u>Id.</u>  The ALJ then found that none of Magnusson's impairments, either alone or in combination, met or equaled an impairment listed in Appendix 1, Part 404, Subpart P of the Commissioner's regulations.  <u>Id.</u>  Accordingly, the ALJ went on to determine Magnusson's residual functional capacity (RFC).  <u>Id.</u> at 43-44.

The ALJ determined that before January 9, 2007, Magnusson retained the functional capacity to perform light work that does not require toleration of high levels of stress or a high level of contact with people.  <u>Id.</u> at 43.  However, he ALJ found that on after January 9, 2007, Magnusson's RFC was further restricted

-13-

by mental nonexertional limitations that prevented her from performing her past relevant work or adjusting to work that exists in significant numbers in the national economy.  Id. at 44.  Accordingly, the ALJ found that Magnusson was under a disability as of January 9, 2007.  Id.

Although Dr. Alysson opined that Magnusson's PTSD symptoms had persisted for six months or more, the ALJ concluded that the limitations found by Dr. Alysson in Magnusson's MRFCA could not be applied retroactively prior to the date of her report because these "work-related limitations must be based on objective medical findings and there were not [*sic*] until the date of her report."  Tr. 42.

## II. <u>STANDARD OF REVIEW</u>

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  My review is limited to whether the Commissioner (through the ALJ and the Appeals Council) applied the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The Commissioner's factual findings "shall be conclusive

-14-

if supported by 'substantial evidence.'"   <u>Irlanda Ortiz v. Sec'y</u>
<u>of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991)
(quoting 42 U.S.C. § 405(g)).   Further, the Commissioner is
responsible for determining issues of credibility, drawing
inferences from the record evidence, and resolving conflicts in
the evidence.   <u>Id.</u>   The findings are not conclusive, however,
when they are derived by "ignoring evidence, misapplying the law,
or judging matters entrusted to experts."   <u>Nguyen</u>, 172 F.3d at
35.


### III.   <u>ANALYSIS</u>

      The issue presented by this case is whether the ALJ
correctly determined the onset date of Magnusson's disability.
The onset date is the first day an individual is disabled as
defined by the Act and is critical because it may affect the
period for which a claimant can be paid and may even be
determinative of whether a claimant is entitled or eligible for
benefits.   Social Security Ruling 83-20, Program Policy
Statement: Titles II and XVI: Onset of Disability (PPS-100), 1983
WL 31249 (S.S.A. 1983) ("SSR 83-20").   The ALJ found that
Magnusson was disabled as of January 9, 2007.   Magnusson,
however, contends that she was disabled as of May 20, 2005.
Magnusson argues that the ALJ violated SSR 83-20 by not treating
her PTSD as a disability of traumatic origin and failing to

-15-

consult with a medical advisor before determining the onset date
of Magnusson's disability.  Further, Magnusson asserts that the
ALJ's finding that her onset date was January 9, 2007 is not
supported by substantial evidence.[3]

## A.   The SSR 83-20 Framework

         SSR 83-20 sets forth an analytical framework for assessing
the date of onset for a disability.  For disabilities of
traumatic origin, the onset date is established by the date of
the injury.  SSR 83-20 at *2.  For disabilities of nontraumatic
origin, determination of the onset date is less precise and
factors to be considered include "the applicant's allegations,
work history, if any, and the medical and other evidence
concerning impairment severity."  Id.  SSR 83-20 notes that with
some slowly progressive impairments, including some mental

---

[3] As a preliminary matter, I note that Dr. Alysson's June
20, 2007 letter clarifying her opinion was submitted only to the
Appeals Council and was not seen by the ALJ.  In reviewing the
Commissioner's decision, I am limited to the evidence that was
submitted to the ALJ.  Mills v. Apfel, 244 F.3d 1, 5 (1st Cir.
2001).  When the Appeals Council denies review after new evidence
has been presented, the court may review that decision only if
the Council gave "an egregiously mistaken ground for this
action."  Id.  "Alternatively, the court may remand a case for
further consideration if material new evidence is submitted and
the party introducing the evidence shows good cause for failing
to present that evidence to the ALJ."  Larocque v. Barnhart, 468
F. Supp. 2d 283, 287 (D.N.H. 2006) (citing § 405(g); Freeman v.
Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001)).
     Magnusson has shown neither an egregious mistake by the
Appeals Council nor good cause for not presenting the evidence to
the ALJ.  Thus, I will not review the Appeals Council decision
and will not consider Dr. Alysson's June 20, 2007 letter.

impairments, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." Id.  "In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." Id. "[T]he date alleged by the individual should be used if it is consistent with all the evidence available. . . . However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." Id. at *3.

Because the judgment about how long an impairment may have existed at a disabling level of severity must have a "legitimate medical basis," SSR 83-20 provides that an ALJ "should call on the services of a medical advisor when onset date must be inferred." Id.  In sum,

> [t]he onset dates should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death.  Convincing rationale must be given for the date selected.

Id.

B.   **Magnusson's Arguments**

  1. ***Traumatic Origin Provision of SSR 83-20***

First, Magnusson argues that her PTSD is a disability of traumatic origin and, accordingly, that SSR 83-20 mandated the

-17-

ALJ to find the onset of Magnusson's PTSD as the date of her traumatic injury, i.e., her breast cancer diagnosis.

Whether a disability is of traumatic or nontraumatic origin under SSR 83-20 is question that an ALJ must resolve.  See Blea v. Barnhart, 466 F.3d 903, 910-11 (10th Cir. 2006).  Accordingly, the ALJ is not required to use the date of Magnusson's cancer diagnosis as her onset date.  Furthermore, while PTSD is caused by a traumatic event, it does not necessarily manifest itself simultaneously with the causal event.  See American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. 2000); see also Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995)("Although PTSD may not be degenerative in the same classic sense as a condition like diabetes, PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation."); Morgan v. Sullivan, 945 F.2d 1079, 1081 (9th Cir. 1991) ("Mental disorders may manifest themselves over a period of time.").

In this case, the ALJ's implicit decision to treat PTSD as a nontraumatic injury for purposes of establishing its onset date is supported by substantial evidence because, while the genesis of Magnusson's PTSD may have been her breast cancer diagnosis, it is not readily apparent that her PTSD was disabling at the time of her cancer diagnosis.  Although Dr. Alysson opined in a

retrospective diagnosis that Magnusson's PTSD arose from her May 20, 2005 cancer diagnosis, no other evidence in the record indicates that at the time of her cancer diagnosis Magnusson was expected to be unable to engage in substantial gainful activity due to PTSD.  See Jones, 65 F.3d at 103 (holding that retrospective medical diagnoses constitute relevant evidence to establish onset dates, but alone will usually not suffice unless the claimed disability date is corroborated by other evidence.) For example, while Magnusson testified that she first became depressed during the summer of 2005, she also testified that she believed her depression had worsened over time.  Tr. at 13, 17. In August 2005, Magnusson reported to a physician's assistant that she was in "good spirits," and did not report her first symptoms of mental impairments until June 29, 2006.  Id. at 274, 308.  Further, Dr. Feitelson's assessment of Magnusson in October 2006 indicated that she had some difficulty in social or occupational functioning, but was not disabled.  Therefore, I conclude that the ALJ's implicit decision to treat Magnusson's PTSD as a disability of nontraumatic origin in order to determine its onset date comports with the substantive requirements of SSR 83-20 and was supported by substantial evidence.

### 2.  *Evidence of Onset Date*

The issue of whether the ALJ's finding of a January 9, 2007 onset date comports with the requirements of SSR 83-20 and has a

legitimate basis is a much closer question.  SSR 83-20 provides that "medical evidence serves as the primary element in the onset determination," but if medical evidence is not available to establish the precise date an impairment became disabling "it will be necessary to infer the onset date."  SSR 83-20 at *2.  In addition, SSR 83-20 ordinarily requires an ALJ to consult a medical advisor when the onset of a disability must be inferred from ambiguous evidence to insure that the determination is based upon a 'legitimate medical basis.'  See, e.g., Blea, 466 F.3d at 911; Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001); Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997); Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995); Spellman v. Shalala, 1 F.3d 357, 362 (5th Cir. 1993); DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991).

Magnusson contends that a medical advisor was necessary because the medical evidence of the onset date of her disability is ambiguous.  She alleges that ambiguity existed because Dr. Alysson's PTSD diagnosis and opinion of 2005 onset conflicted with Dr. Feitelson's treatment notes, which contain no diagnosis of PTSD and no opinion of onset.  Magnusson also points to the fact that the difference in GAF scores given to her by Dr. Alysson and Dr. Feitelson show a significantly different assessment of Magnusson's ability to function.  Dr. Feitelson diagnosed Magnusson with depression with a GAF of 65, which is

not consistent with disabling mental nonexertional limitations. Dr. Alysson diagnosed Magnusson with PTSD, social phobia, and depression with a GAF of 45-40, consistent with very serious impairment in occupational functioning.

Rather than finding an inconsistency in the medical evidence that required calling on the services of a medical advisor, the ALJ attributed the discrepancies between Dr. Feitelson's and Dr. Alysson's findings to a worsening of Magnusson's mental functioning.  Tr. at 40.  Further, the ALJ found that Dr. Alysson's assessment of Magnusson's functional capacity could not be applied retroactively because there was no evidence to corroborate disability prior to Dr. Alysson's assessment.  Id. at 42.

I agree that, although Magnusson's PTSD may have had roots at a time well before its documentation by Dr. Alysson in 2007, there is little evidence to corroborate Dr. Alysson's opinion that Magnusson's PTSD was disabling beginning on May 20, 2005. See Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 79 (1st Cir. 1982) (holding that it is insufficient to establish that a mental impairment had its roots during a particular time period, there must be evidence of when the mental impairment became disabling); see also Flint v. Sullivan, 951 F.2d 264, 267 (10th Cir. 1991) (retrospective diagnosis of PTSD and subjective testimony without other evidence of actual disability is

insufficient for an award of benefits).  Although Magnusson has not engaged in substantial gainful activity since May 20, 2005, medical evidence indicates that she was not disabled due to her mental condition at that time.  In August 2005, Magnusson reported to a physician's assistant that she was in "good spirits."  Tr. at 274.  Her first reports of symptoms of mental impairments didn't occur until June 29, 2006 when she complained to Dr. Vaughan of anxiety and fatigue.  Id. at 308.  The medical record does not reveal any further such complaints until October 18, 2006 when Magnusson first saw Dr. Feitelson, who diagnosed Magnusson with major depressive episode and assessed a GAF score of 65, indicating that she had some difficulty in social or occupational functioning, but generally functioned pretty well and was not disabled.  Furthermore, on November 2, 2006, Dr. Hendrick noted that Magnusson's condition was unchanged from her visit with Dr. Feitelson.  Finally, although Magnusson originally filed her disability application in February 2006, she did not allege any mental impairments until she submitted a medical update form to the Commissioner in late 2006, alleging depression.  Id. at 159-60.

But despite the lack of evidence corroborating an onset date of May 20, 2005, there is substantial evidence indicating the existence of symptoms consistent with PTSD prior to January 9, 2007 and a worsening of Magnusson's condition over time.

Magnusson's symptoms began at least in 2006 and her complaints to doctors increased throughout that year.  Then in January and February 2007, the medical evidence indicates that the severity of Magnusson's complaints and symptoms became more pronounced. In addition, Magnusson's history of a consistently decreasing work schedule during the relevant time period corroborates the worsening of her condition over time.  Magnusson herself testified that she believed her mental impairments "worsened over time."  Tr. at 17.

Given the apparent worsening of Magnusson's condition, the evidence concerning onset date of Magnusson's disability is ambiguous because it is unclear when Magnusson's mental impairment first restricted her functional capacity.  Dr. Alysson's January 10, 2007 report is the first assessment that Magnusson's PTSD and mental impairments were disabling.  With a slowly progressive condition such as Magnusson's mental condition, however, the onset date is generally sometime earlier than the date of diagnosis and the medical evidence must be studied retrospectively to determine when the condition actually became disabling.

Although an onset date earlier than November 2, 2006 may be inconsistent with the other medical evidence of record, no doctor asserts that January 9, 2007 was the day that Magnusson's mental

impairments became disabling.  There is no evidence to indicate why January 9, 2007 is significant to Magnusson's disability other than the fact that it was one of two days she was evaluated by Dr. Alysson and the day after she met with Dr. Hammond for an evaluation of her oncology progress.  Dr. Alysson's January 10, 2007 report diagnosing Magnusson's PTSD was based on extensive testing conducted on December 8, 2006 and January 9, 2007, and Dr. Alysson clearly opined that Magnusson had endured the symptoms of PTSD for six months or more.  Even if it was unclear that Dr. Alysson's retrospective diagnosis of Magnusson's disability extended back to May 2005, at the very least, there is no doubt that Dr. Alysson believed Magnusson to be as limited by her mental impairments on December 8, 2006 as she was on January 9, 2007.  However, the ALJ offers no convincing rationale for choosing January 9, 2007 as Magnusson's onset date rather than December 8, 2006 or another date.  Although Magnusson's visit with Dr. Hammond on January 8, 2007 intervened between her two meetings with Dr. Alysson, Dr. Hammond noted that Magnusson displayed symptoms of mental impairments, did not assess the limiting effects of these impairments, and did not opine on Magnusson's disability status.  Thus, Dr. Hammond's report was not inconsistent with a finding that Magnusson was disabled due to her mental impairments prior to January 9, 2007.  If anything,

the medical evidence created an ambiguity as to the onset date of Magnusson's disability.

The ALJ's fixing of January 9, 2007 as the onset date of Magnusson's disability without a legitimate medical basis or the testimony of a medical advisor was a violation of SSR 83-20. Under SSR 83-20, if onset date cannot be determined from the medical evidence, a medical advisor must be called to testify to onset date.  In this case, the onset date of Magnusson's mental disability was, at best, ambiguous.  Rather than calling a medical advisor to testify to onset date, the ALJ fixed January 9, 2007 as the onset date of Magnusson's disability without any supporting evidence.  Thus, without the testimony of a medical advisor, there was no legitimate medical basis for the onset date imposed by the ALJ.  A remand is necessary because the ALJ's reasoning failed to comport with the substantive requirement of SSR 83-20 that judgments must have a legitimate medical basis.

## IV.  CONCLUSION

For the foregoing reasons, I vacate the Commissioner's decision and remand this case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  Magnusson's motion to remand (Doc. No. 9) is granted.  The Commissioner's motion to affirm (Doc. No. 10) is denied.  The clerk is directed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 13, 2009

cc:  Jonathan Baird, Esq.
     Gretchen Leah Witt, AUSA